UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD NICHOLS,<br><br>    Plaintiff,<br><br>v.<br><br>COVIDIEN LP, et al.,<br><br>    Defendants. | Case No. 20-cv-06836-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 27 |

Plaintiff is Mr. Donald Nichols, a former patient at Saint Joseph Hospital in Eureka, California who received surgical treatment for rectal cancer. Mr. Nichols alleges that the medical stapler which was used during his surgery was defective, and he sues the entities responsible for the manufacture and distribution of that stapler. Mr. Nichols has filed a Second Amended Complaint alleging three causes of action: (1) strict products liability for a manufacturing defect, (2) common law negligence, and (3) strict products liability under a failure to warn theory. Docket No. 23. Mr. Nichols seeks medical and incidental expenses, loss of earnings and/or earning capacity, and general damages. Defendants move to dismiss under Rule 12(b)(6). Docket No. 27.

**I.   BACKGROUND**

A.   Factual Allegations in the Complaint

In the SAC, Mr. Nichols alleges as follows. Defendant Medtronic, Inc. is a medical device sales company which sells its products throughout California, including to St. Joseph Hospital. SAC ¶ 10. Covidien LLC is a wholly owned subsidiary of Medtronic, Inc. and also maintains a large sales operation for its products throughout California. *Id.* ¶¶ 11-12. Covidien and Medtronic

(collectively, "Defendants") are individually, jointly, and severally liable for damages which Mr. Nichols suffered as a result of Defendants' design, manufacturing, marketing, labeling, distribution, sale, and placement of the Covidien products at issue in this suit. *Id.* ¶ 16.[1]

Defendants design, manufacture, and sell End to End Anastomosis Staplers ("EEA staplers"), which are devices used by medical service providers in surgical procedures. *Id.* ¶ 20. EEA staplers enable surgeons to create a secure anastomosis (*i.e.*, a connection between two internal bodily structures) within the body and form a seal. *Id.* The stapler used during Mr. Nichols's surgery (and identified in hospital billing records) is called an Endo GIA stapler. *Id.*

Mr. Nichols was admitted to St. Joseph Hospital in Eureka, California on September 28, 2018 for treatment of rectal cancer. *Id.* ¶ 22. He underwent a low anterior resection, and the surgeon (Dr. Thomas J. Rydz) used an Endo GIA stapler to create an anastomosis. *Id.* ¶ 23. Even though Dr. Rydz used the stapler properly during the procedure, the stapler misfired repeatedly. *Id.* ¶¶ 23, 27. Mr. Nichols alleges that Dr. Rydz noted the malfunction in a post-surgery report, writing "we had significant problems with the stapler device used at the time of surgery. There were some misfirings of the stapler…" *Id.* ¶ 23. *See also* Kaufman Declaration, Ex. 1 (highlighted portions on the official Discharge Report noting that a few days after the surgery, Mr. Nichols suffered from an "anastomotic leak and peritonitis") (Docket No. 29-1).

1.  Alleged Manufacturing Defects: Sled Components and Pin Components

Mr. Nichols alleges that the misfirings occurred because the Endo GIA stapler was missing a "sled component," a part of the device which helps ensure staple deployment. *Id.* ¶ 24. Staplers lacking sled components will not reliably deploy staples, and this can result in a failure to form a robust anastomosis (leading to bleeding or leakage of luminal contents). *Id.*

Next, Mr. Nichols alleges that the Endo GIA stapler that was used is missing one of two "pin components," which are designed to maintain alignment of the stapler device jaws. *Id.* ¶ 25. An Endo GIA stapler without a pin component may result in incomplete staple formation, which,

---

[1] Mr. Nichols also names DOES 1-10, alleging these unnamed defendants were "representative, agent, employee, joint venturer, or alter ego of each of the other defendants," and states that the complaint will be amended when their identities are discovered. *Id.* ¶¶ 17-18.

in turn, leads to bleeding, anastomotic leaks, peritonitis, or pneumothorax. *Id.* Mr. Nichols alleges that the stapler which was used by Dr. Rydz suffered from both manufacturing defects, which resulted in the failure of the stapler to form a proper staple line. *Id.* ¶ 26.

As a result, in the days following the surgery, an anastomotic leak was discovered, which physicians attempted to repair and which required prolonged hospitalization for several weeks. *Id.* ¶¶ 27, 29-30. All told, Mr. Nichols remained in the hospital for nearly a month due to complications from the stapler malfunction and suffered significant scarring. *Id.* ¶ 31, 32.

Mr. Nichols alleges that Defendants were aware that the Endo GIA stapler used for Mr. Nichols' surgery frequently malfunctions and that it contains defects. *Id.* ¶¶ 33-34. The stapler used on Mr. Nichols has been the subject of a recall, and the FDA has proposed reclassifying it from a Class I device to a Class II device that one subject to Special Controls – this proposed reclassification meant that manufacturers such as Defendants had to publicly report all malfunctions or injuries related to the Endo GIA stapler. *Id.* ¶¶ 7, 35, 40.

2. <u>Defendants' Alleged Concealment of Malfunctions via FDA's Reporting Scheme</u>

The next component of Mr. Nichols's factual allegations involves the Manufacturer and User Facility Device Experience ("MAUDE") database, a publicly accessible database run by the Food & Drug Administration. *Id.* ¶ 4. While there are significant numbers of stapler-related incidents each year (including 412 reported deaths, nearly 12,000 reported severe injuries, and roughly 98,500 malfunctions between 2011 and 2018), the majority of Defendants' reports were submitted to the Alternative Summary Reporting ("ASR") Program, a non-public database which hides the nature and severity of stapler-related incidents from surgeons and the public.[2] *Id.* ¶¶ 4-5. The purpose of ASR is to allow for quarterly summary reports of well-known events in lieu of individual reports, but Defendants used the ASR system to keep the scope of injuries related to

---

[2] Under the ASR Program, manufacturers of certain devices could request an exemption from the requirement to file individual medical device reports for certain events that were well-known and well-established risks associated with a particular device. These manufacturers were permitted to submit "quarterly summary reports" of such events, which allowed FDA to more efficiently review reports of well-known events and focus on taking action on new safety signals and less understood risks. The ASR Program was formally ended in June 2019. *See* https://www.fda.gov/news-events/press-announcements/statement-agencys-efforts-increase-transparency-medical-device-reporting.

1  surgical staplers hidden from surgeons and their patients.  *Id.* ¶ 6.

2        Mr. Nichols alleges that Defendants misused the ASR Program to avoid reporting new and
3  novel malfunctions of surgical staplers that cause severe injury, as these new malfunctions would
4  have subjected the staplers to recall or reclassification.  *Id.* ¶ 35.  Defendants allegedly reported
5  injuries under the term "malfunctions" to avoid public disclosure and to ensure that the FDA did
6  not recall these devices or reclassify them into a higher risk category.  *Id.* ¶¶ 36-37.  This resulted
7  in a vast disparity between the "hidden" database and the public MAUDE reporting system.

8        Despite the dangers of surgical staplers which caused FDA to consider reclassification
9  from Class I to Class II, Defendants continued to market the Endo GIA staplers as safe and failed
10 to include warnings regarding potential malfunctions (which were known to them by virtue of
11 being reported in the ASR system).  *Id.* ¶ 41.  More specifically, Defendants intentionally failed to
12 (1) provide warnings regarding the potential for surgical staplers to malfunction in the very
13 manner which occurred during Mr. Nichols's surgery; (2) warn and inform surgeons of the
14 potential for its staplers to malfunction in that manner; and (3) recall their defective products when
15 Defendants knew they were prone to malfunction.  *Id.* ¶ 42.

16               **II.**    **<u>DISCUSSION</u>**

17 A.    <u>Motion to Dismiss</u>

18       Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain
19 statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A
20 complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil
21 Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss
22 after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*
23 *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must
24 . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765
25 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true
26 and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*
27 *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a
28 complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

1  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself
2  effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).  "A claim has facial
3  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable
4  inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The
5  plausibility standard is not akin to a probability requirement, but it asks for more than a sheer
6  possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B.   <u>Strict Products Liability Manufacturing Defect</u>

To state a claim under a strict liability theory for a manufacturing defect, Mr. Nichols must allege the following elements: "(1) he has been injured by the product; (2) the injury occurred because the product was defective; and (3) the defect existed when the product left the hands of the defendant." *Tucker v. Wright Med. Tech., Inc.*, No. 11-cv-03086-YGR, 2013 U.S. Dist. LEXIS 38354, at *34 (N.D. Cal. Mar. 19, 2013); *Wu v. EAN Holdings, LLC*, No. 5:13-cv-00188-PSG, 2014 U.S. Dist. LEXIS 4010, at *3-5 (N.D. Cal. Jan. 10, 2014) (same).

A manufacturing defect exists where the product "is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 429, 143 Cal. Rptr. 225, 236, 573 P.2d 443, 454 (1978)). *Cf. Carson v. Depuy Spine, Inc.*, 365 F. App'x 812, 814 (9th Cir. 2010) ("[t]o prove a negligent manufacturing claim under California law, a plaintiff must first show that the product as delivered departed from the governing specifications").  Thus, a manufacturing defect claim alleges that "a suitable design is in place, but that the manufacturing process has in some way deviated from that design." *In re Coordinated Latex Glove Litig.*, 99 Cal. App. 4th 594, 613, 121 Cal. Rptr. 2d 301, 315 (2002).  For instance, "when a product comes off the assembly line in a substandard condition it has incurred a manufacturing defect." *Barker*, 20 Cal. 3d at 429.

Mr. Nichols has plausibly alleged the necessary components for a strict liability manufacturing defects claim.  Mr. Nichols alleges that the described defect existed when the product left Defendants' hands. *Id.* ¶¶ 44 ("[t]hese manufacturing defects existed when the products left the manufacturers' control"), 47 ("[t]he Endo GIA stapler used in Plaintiff's procedure had not been materially altered or modified prior to its use in Plaintiff").  He also

5

1   alleges but-for causation: he alleges that he was injured by the Endo GIA stapler as a direct result
2   of the defects he describes. SAC ¶ 48 ("[a]s a direct and proximate result of the exposure to the
3   defective Endo GIA stapler, Plaintiff suffered injuries and damages as described herein").
4       Mr. Nichols further provides specific details about how the Endo GIA stapler used in his
5   surgery deviated from its intended design and from other ostensibly identical units of the same
6   product line. The SAC alleges that the stapler used on him lacked a "sled component," which
7   helps ensure staple deployment. *Id.* ¶¶ 24, 26. And Mr. Nichols alleges that the stapler lacked one
8   of two pin components designed to maintain the alignment of the device jaws, and that using
9   staplers with incomplete pin components can lead to incomplete staple formation (which
10  Defendants have acknowledged can lead to an anastomotic leak). *Id.* ¶¶ 25, 26. Defendants have
11  "publically acknowledged" that these defective staplers were distributed to physicians between
12  April 2014 and April 2019, during the timeframe of Mr. Nichols's surgery (September 2018).
13  SAC ¶ 25; Opp. at 6. Because this stapler lacked a sled component and one of two pin
14  components, it "was manufactured in [a] manner that deviated from Defendants['] intended
15  design, and in a way which failed to meet Defendants['] specification."[3] *Id.* ¶ 44. In sum, Mr.
16  Nichols has plausibly alleged a manufacturing defect under a strict liability theory.

17  C.    <u>Negligent Design</u>
18      Mr. Nichols alleges, as part of his negligence claim, negligence in design. A product's

---

[3] Mr. Nichols notes that EEA is an acronym for "end-to-end anastomosis," and is a generic term for all staplers, regardless of manufacturer or brand name. Opp. at 1. Thus, even though hospital billing records indicate that Mr. Nichols was operated on with an Endo GIA stapler, his surgeon, Dr. Rydz, used the generic term EEA stapler. *Id.* at 1-2 (citing Kaufman Decl., Ex. 1 ("[w]e had significant problems with the *EEA stapler device*")) (emphasis added). In the Reply brief, Defendants note that EEA staplers are circular staplers and are a different product altogether from Endo GIA staplers (which are linear staplers). Reply at 4. Because EEA and Endo GIA staplers have different applications, Defendants demand a clearer allegation from Mr. Nichols as to which product he was injured by. *Id.* However, the Complaint is replete with allegations that it was the "Endo GIA" stapler which specifically harmed Mr. Nichols, and Mr. Nichols also attached a hospital billing report with highlighted portions indicating that Dr. Rydz used the Endo GIA stapler in particular. *See* Kaufman Decl., Ex. 2 (hospital billing records) (Docket No. 29-1). Further, Mr. Nichols cites this hospital billing report, and the price of an Endo GIA stapler, when alleging that there was an economically feasible alternative design under a negligent design defect theory. SAC ¶ 59 ("[a]ccording to Mr. Nichols' medical billing records, Plaintiff was billed approximately $3,552.49 for the stapler used in his procedure"). The complaint is clear in identifying the stapler at issue.

6

1   design is defective "if it either violates the minimum safety expectations of an ordinary consumer
2   or contains dangers which outweigh its benefits." *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548,
3   570 n.7, 34 Cal. Rptr. 2d 607, 619, 882 P.2d 298, 310 (1994). As the California Supreme Court
4   has explained, the test for negligent design "involves a balancing of the likelihood of harm to be
5   expected from a machine with a given design and the gravity of harm if it happens against the
6   burden of the precaution which would be effective to avoid the harm." *Merrill v. Navegar, Inc.*,
7   26 Cal. 4th 465, 479, 110 Cal. Rptr. 2d 370, 381, 28 P.3d 116, 125 (2001) (citing *Pike v. Frank G.
8   Hough Co.*, 2 Cal. 3d 465, 470, 85 Cal. Rptr. 629, 632, 467 P.2d 229, 232 (1970)). The Ninth
9   Circuit has also held that "[a]s the common law of torts long ago recognized, the rational
10  calculation of risk requires multiplying the magnitude of a threatened loss by the probability of its
11  occurrence." *Arrendondo v. Neven*, 763 F.3d 1122, 1131 (9th Cir. 2014) (citing *United States v.
12  Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947)) (the famous "burden-probability-loss," or
13  "BPL" formula, for the law of negligence developed by Judge Hand). Separate and distinct from
14  the balancing test of negligence, is an inquiry into the availability of reasonable alternative design;
15  the plaintiff must demonstrate that there was a safer design that was also economically feasible.
16  *See* Restat. 3d of Torts: Products Liability, § 2(b) ("[a] product is … defective in design when the
17  foreseeable risks of harm posed by the product could have been reduced or avoided by the
18  adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the
19  commercial chain of distribution, and the omission of the alternative design renders the product
20  not reasonably safe").
21      The defective design which Mr. Nichols alleges is the Endo GIA stapler's manual
22  operation, which results in the stapler "failing to fire staples properly, despite appropriate
23  utilization by a surgeon." SAC ¶ 53. At the motion hearing, the Court expressed concerns about
24  the scope of Plaintiff's negligent design defect theory, which seemed to sweep all manually
25  operated staplers into its reach. The complaint lacks reasonable specificity in this regard. Plaintiff
26  must specifically allege why the Covidien Endo GIA stapler is defectively designed. The
27  ambiguity of Plaintiff's negligent design claim fails to give Defendants fair notice of the claim.
28  *Levitt*, 765 F.3d at 1135. The Court grants Defendants' motion to dismiss the negligent design

1  defect cause of action with leave to amend.

2  D.  Strict Products Liability Failure to Warn

3  California law recognizes failure to warn claims under both strict liability and negligence theories. *Webb v. Special Elec. Co., Inc.*, 63 Cal. 4th 167, 181, 202 Cal. Rptr. 3d 460, 470, 370 P.3d 1022, 1030 (2016). In general, "a product seller will be strictly liable for failure to warn if a warning was feasible and the absence of a warning caused the plaintiff's injury." *Id. See also Kase v. Metalclad Insulation Corp.*, 6 Cal. App. 5th 623, 644, 212 Cal. Rptr. 3d 198, 214 (2016) (holding that a product seller "will be strictly liable for failure to warn if a warning was feasible and the absence of a warning caused the plaintiff's injury … [r]easonableness of the seller's failure to warn is immaterial in the strict liability context"). Manufacturers must warn about known dangers in that scientific field: "manufacturers [are held] strictly liable for injuries caused by their failure to warn of dangers that were known to the scientific community at the time they manufactured and distributed their product." *Johnson v. Am. Standard, Inc.*, 43 Cal. 4th 56, 64, 74 Cal. Rptr. 3d 108, 114, 179 P.3d 905, 910 (2008). *Cf. Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 1003, 281 Cal. Rptr. 528, 538, 810 P.2d 549, 559 (1991) ("under strict liability principles … the manufacturer is liable if it failed to give warning of dangers that were known to the scientific community at the time it manufactured or distributed the product"). These principles for strict liability apply to the dangers which were known *at the time of manufacture or distribution*.

20  Mr. Nichols alleges that the stapler which was used in his September 2018 surgery was a model which Defendants knew malfunctioned frequently and contained defects. SAC ¶¶ 33, 34. Mr. Nichols also alleges that he was injured as a direct result of this failure to warn. *Id.* ¶ 67. But Mr. Nichols has not provided any details about the warnings which Dr. Rydz received before the surgery, and why those warnings were inadequate (*i.e.*, why those warnings did not inform Dr. Rydz of the known danger of staples misfiring during the manual operation of the Endo GIA Stapler). Nor has Mr. Nichols alleged with specificity what warning was feasible (*e.g.*, he does not provide an indication as to what a proper warning would look like and how it would be placed on the stapler package).

8

Nonetheless, Mr. Nichols describes the deficiencies of the ASR program, and how it conceals the nature and severity of Endo GIA stapler-related incidents. Mr. Nichols alleges that Defendants abused the ASR Program to avoid public reporting of stapler-related incidents in the MAUDE database, which would have subjected the staplers to a recall. SAC ¶ 35. Further, Defendants allegedly reported injuries under the term "malfunctions" to avoid public disclosure and to ensure that FDA did not recall the staplers. *Id.* ¶¶ 36-37. This resulted in a vast disparity in reporting between the ASR database and the public MAUDE reporting system. For instance, Mr. Nichols notes that in 2016, nearly 10,000 stapler "malfunctions" were included in the non-public ASR system but only 84 stapler injuries or malfunctions were submitted to the public MAUDE database. *Id.* ¶ 38. It may reasonably be inferred that public reporting in the MAUDE database would have provided a feasible warning to patients and doctors alike about the dangers of the Endo GIA stapler. Wider dissemination of information would have provided the requisite warnings about the potential for sled and pin components to be missing from the stapler. This particular failure to warn theory, which involves the ASR and MAUDE databases, is therefore plausible. The SAC does not state whether there are other failure to warn theories which Mr. Nichols alleges.

Accordingly, the Court denies Defendants' motion to dismiss the strict products liability failure to warn cause of action.

### III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants' Motion to Dismiss. The Court **GRANTS** Defendants' motion to dismiss the negligent design claim **without prejudice**. It **DENIES** Defendants' motion to dismiss the strict products liability manufacturing defect claim and the strict products liability failure to warn claim.

This order disposes of Docket No. 27.

**IT IS SO ORDERED**.

Dated: February 26, 2021

_____
EDWARD M. CHEN
United States District Judge

9